UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
CASHEW HOLDINGS, LLC,

               Plaintiff,

   -against-

CANOPIUS US INSURANCE, INC., F/K/A OMEGA US INSURANCE, INC.,

               Defendant.
------------------------------------------------------------------- x

MEMORANDUM AND ORDER
13-CV-4528 (ERK) (SMG)

GOLD, STEVEN M., U.S.M.J.:

## INTRODUCTION

Plaintiff, Cashew Holdings LLC, is the owner of a three-family residential building (the "property" or the "building"), used as an income-producing rental property in Rockaway Park, New York. Korinsky Aff.,¶¶ 1-3 Docket Entry 8-1. The building was damaged during Superstorm Sandy in October, 2012. *Id*. ¶ 8. At that time, a policy of insurance issued by defendant Canopius US Insurance, Inc. (the "policy") that excluded water damage was in force.

After retaining experts to inspect its property, plaintiff submitted a claim to defendant seeking coverage for approximately $210,000 in damages caused by the storm but not as a result of flooding. *Id*. ¶¶ 11-18. Defendant paid approximately $19,000 of the claim and denied the remainder. *Id*. Defendant subsequently informed plaintiff that it would not renew plaintiff's insurance policy, and that the policy would expire on August 7, 2013. *Id*. ¶ 29.

Plaintiff originally filed this action in Queens County Supreme Court on or about August 1, 2013. At that time, plaintiff sought and obtained an Order directing defendant to show cause why it should not be preliminarily enjoined from cancelling plaintiff's insurance policy and immediately paying plaintiff's claim for coverage. The Order further provided that "Defendant

is enjoined from cancelling the Insurance Policy, and must continue coverage under the Insurance Policy," pending a hearing on the Order to Show Cause. Docket Entry 1-3, at 1-2.

Defendant removed the action to this Court on August 12, 2013, apparently before a hearing on the Order to Show Cause issued by the Supreme Court for Queens County was held. Plaintiff now moves in this Court for a temporary restraining order and preliminary injunction directing defendant to pay its claim and maintain the insurance in place, Docket Entry 8, and defendant has cross-moved to dissolve the Order issued by the Queens County Supreme Court, Docket Entry 9. The parties have consented to have their pending cross-motions decided by a magistrate judge. I held an evidentiary hearing on August 26 and 28, 2013. For the reasons stated below, plaintiff's motion is denied and defendant's motion is granted.

## DISCUSSION

A plaintiff seeking a preliminary injunction must demonstrate: 1) a reasonable likelihood of success on the merits, 2) a likelihood of irreparable injury in the absence of an injunction, 3) that the balance of hardships tips in favor of the plaintiff, and 4) that the public interest would not be disserved by an injunction. *See eBay Inc. v. Mercexchange, L.L.C*, 547 U.S. 388, 391 (2006); *Salinger v. Colting*, 607 F.3d 68, 77-79 (2d Cir. 2010); *New York City Triathlon, L.L.C. v. NYC Triathalon Club, Inc.* 704 F. Supp. 2d 305, 313 (S.D.N.Y. 2010). To obtain a preliminary injunction, a plaintiff must confront "alleged threats of irreparable harm [that] are not remote or speculative but actual and imminent." *Lopez v. McEwan*, 2010 WL 326206, at *8 (D. Conn. Jan. 22, 2010), quoting *New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 775 (2d Cir. 1977). A plaintiff who has not established a likelihood of success on the merits may nevertheless qualify for a preliminary injunction by demonstrating that his case raises

2

sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *Salinger*, 607 F.3d at 79.

A.   *Irreparable Injury*

Plaintiff contends that, absent payment on its claim from defendant, it is unable to afford to repair the property. Plaintiff further claims that it cannot find a carrier willing to insure the property in its unrepaired state. Accordingly, argues plaintiff, it faces a substantial risk of losing the property if it is further damaged, or a tenant living on the property is injured, while the property is uninsured. Plaintiff therefore contends that it can avoid irreparable injury only if defendant is ordered to pay plaintiff's insurance claim and maintain its policy of insurance on plaintiff's property.

Plaintiff's claim of irreparable injury fails in several respects. First, Michael Korsinsky, a member of the LLC, testified that the building is habitable as is, and that two of the three rental units are currently occupied by paying tenants. Although Korsinsky expressed concern about the possibility that a tenant or guest might have an accident or suffer an injury on the property while it is not insured, that possibility is too remote to support a claim of immediate irreparable injury.

Moreover, plaintiff has not offered evidence sufficient to support a finding that it cannot afford repairs sufficient to render the building insurable while awaiting the outcome of this lawsuit. Korsinsky testified at the hearing that, having borrowed less than $100,000, the LLC purchased the property for $330,000 in June 2012. The remaining amount required for the purchase – more than $230,000 in cash – was contributed by the two members of the LLC, Korsinsky and Joseph Klein. Shortly after it acquired the property, the LLC listed it for sale at a price of $565,000. Korsinsky explained during his testimony that the LLC acquired the property at a substantial discount, thus justifying an asking price considerably higher than the one so

recently paid by the LLC. It thus appears that the two partners of the LLC were able to raise more than $230,000 in cash in June of 2012m and that the property, largely unencumbered by debt, is sufficiently valuable to serve as collateral for a substantial loan.

In addition to their status as co-members of the LLC, Korsinsky and Klein are partners in the law firm of Korsinsky and Klein, L.L.P., whose letterhead indicates is staffed by Korsinsky and Klein as well as five additional lawyers. Korsinsky and Klein each own a home. Korsinsky testified that his ability to borrow funds is limited as a result of his involvement in a matrimonial action, but the action was not filed until June 2013, and it thus does not explain why Korsinsky was unable to raise funds to repair the property before that date. No evidence was offered with respect to co-member Klein's ability to contribute or borrow funds for needed repairs. These facts suggest that the LLC had access to sufficient funds to repair the property despite defendant's coverage denial.

Even assuming plaintiff was and is, as claimed, unable to afford the necessary repairs, it does not follow that it will be irreparably injured absent issuance of a preliminary injunction. If plaintiff prevails in this action, defendant will presumably be required to reinsure the property and provide funds for any needed repairs. Plaintiff has failed to explain why such relief will be inadequate. Nor has plaintiff provided any legal precedent for the proposition that a preliminary injunction compelling payment of a disputed claim is available when a failure to pay the claim will result in financial hardship, even when that hardship may include a loss of real property. Finally, plaintiff's contention that it will lose its property is entirely speculative; there may be no further damage to the property or injury to any of its inhabitants or guests during the course of this litigation.

A preliminary injunction is an extraordinary remedy, and a court should not issue one absent a compelling showing. Here, plaintiff has failed to demonstrate that it will suffer an imminent irreparable injury and be left without an adequate remedy at law unless it obtains the injunctive relief it seeks. On this ground alone, plaintiff's motion should be denied and the temporary restraining order issued in Queens County Supreme Court dissolved.

B.  *Likelihood of Success*

Plaintiff's claim has two distinct prongs, each of which I examine separately. First, plaintiff contends that it is likely to succeed in establishing that the property was damaged during Sandy and that the damages are covered by the policy. Second, arguing that it would have repaired the building if defendant had paid its claim, and that the building's state of disrepair was the only reason defendant declined to renew the policy, plaintiff contends that it is likely to succeed in establishing its entitlement to policy renewal.

As discussed above, plaintiff claims that the property damage at issue was caused by Sandy's high winds. The policy contains an exclusions clause that reads in pertinent part as follows:

> B.  Exclusions
>
> > 1.  We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
> >
> > g.  Water
> >
> > > (1)  Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
> > >
> > > (2)  Mudslide or mudflow;

5

> (3) Water that backs up or overflows from a sewer, drain or sump; or
>
> (4) Water under the ground surface pressing on, or flowing or seeping through:
>
> (a) Foundations, walls, floors or paved surfaces;
> (b) Basements, whether paved or not; or
> (c) Doors, windows or other openings
>
> But if Water, as described in g.(1) through g.(4) above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

Poust Decl., Docket Entry 5-5, ¶ 12.

Defendant's engineers inspected the damage to the property after the storm and concluded that some damage to the roof was caused by Sandy's high winds. Defendant paid this portion of plaintiff's claim. Poust Decl. ¶¶ 14-15. Defendant's engineers also found, however, that the remaining damage claimed by plaintiff was "in some instances pre-existing and in others caused by flood waters and buoyant debris hitting the structure or moving within the structure." Poust Decl. ¶ 17 (referencing Ex. 6).

Plaintiff and defendant each presented written reports and testimony from an expert witness during the hearing. Plaintiff's expert, Robert Simpson, described several observations he made about the property in his expert report and his testimony. Of particular pertinence to this case, Simpson stated in his report that "[t]he framed structure above the foundation walls has shifted due to impact and wind loads from Hurricane Sandy." Simpson Report, Pl. Hearing Ex. 4, at 2.[1] Simpson explained both in his report and during his testimony that he reached this conclusion based upon fresh wall cracks and misaligned doors and windows he observed when he inspected the building. In addition to the shifting, or "racking," of the framed structure,

---

[1] Simpson's expert report was also electronically filed by plaintiff as an exhibit in support of its motion. Docket Entry 8-1, at 99-100.

damages described in Simpson's report include shifting of the cinder block walls supporting the front porch as a result of the storm, settlement and cracking of the concrete basement floor, and settlement of interior columns in the middle of the basement. *Id*.

Defendant's expert, Kelly Huff, reached a different conclusion about the impact of Superstorm Sandy. Although Huff observed cracking of interior walls of the house, she attributed the cracks to settlement. Huff did not agree with Simpson's conclusion that the frame of the house had shifted above the foundation. Huff, like Simpson, found that the cinder block walls supporting the porch were displaced during the storm but, unlike Simpson, explained in her report that this shifting was caused by flooding and resulting buoyant forces on the blocks. Huff Report, Def. Hearing Ex. H, at 2.[2]

I find the testimony of defendant's expert more persuasive for several reasons. First, Huff explained – without specific contradiction by Simpson – that, if the frame had in fact shifted significantly, the attic walls as well as those on the lower floors would have cracked. Huff testified that she observed no cracks in the attic walls; Simspon acknowledged that he did not enter the attic during his inspection. Huff also explained that most of the fresh cracks extended from other cracks that were repaired before the storm, suggesting that the cracks were caused by further settlement and not a shifting of the frame. Huff illustrated her point with photographs demonstrating that the new cracks extended from older ones. Huff Report, Fig. 6. Huff further pointed out that the exterior of the house did not reveal any significant wind damage, and opined that there would have been substantial visible exterior damage if the building had been subjected to wind forces sufficiently strong to twist its frame. Huff Report, Figs. 2-5, 18-21. Huff also testified that the misalignment of the doors and windows referenced

---

[2] Huff's expert report was received as an exhibit during the preliminary injunction hearing but, unlike Simpson's report, was not electronically filed with the parties' submissions. The Court will arrange for the electronic filing of Huff's report.

by plaintiff's expert pre-dated Storm Sandy. Again, Huff demonstrated her point with photographs taken during her inspection of the property, including one in which linoleum flooring follows the outline of a badly misaligned doorway saddle. Huff Report, Fig. 9. Simpson's report and testimony, in contrast, was not supported by any photographs or other corroborating objective findings. Moreover, Simpson stated in his report that the shifting of the blocks supporting the porch "was likely caused by external impacts from objects during the storm," without indicating whether those objects were likely propelled by wind or water, the major point in dispute. Simpson Report at 1. In his testimony, however, Simpson agreed with Huff that the blocks supporting the porch were likely shifted as a result of flooding and not by high winds. For these reasons, I find Huff's conclusion that the house did not sustain significant damage from wind to be more credible than the conclusion in Simpson's report that high winds caused the framing of the house to twist or shift.

Moreover, even if I were to credit Simpson's testimony over Huff's, I would still conclude that plaintiff has failed to establish a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor. During his testimony, Simpson acknowledged that, while he believes wind forces were the primary cause of the shifting he described, water likely played some role, albeit a smaller one, as well:

> The entire storm caused damage to the entire structure in various proportions. I don't think you can separate wind damage wholly from wave action and debris floating in the water being driven by the wind up against the house. So as far as the porch is concerned, I think the lion's share would be material and wave action up against it. As far as the racking, I think the lion's share of the cause would be wind, although there could be some effects from wave action and debris floating around in the water hitting the house as well. . . . so it's not one or the other. It's just a combination of the entire event and all aspects of the forces on the house.

Simpson Testimony, Aug. 28, 2013, at 12:04 p.m.[3] As noted above, though, damage caused by water is explicitly excluded from coverage under the policy "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." For these reasons, I conclude that plaintiff's claim that coverage was wrongfully denied is not likely to succeed.

Plaintiff's likelihood of success is further called into question by the estimate of damages it submitted in support of its insurance claim and its pending motion. The estimate, prepared by PFY Building Services and submitted as Exhibit D to the affidavit of Michael Korsinsky in support of plaintiff's motion, Docket Entry 8-1, at 81 *et seq.*, includes items such as "[i]nstall adjustable reinforced steel columns in the cellar adjacent to existing *deteriorated and weak* vertical joist supports. . . and adjust as much as possible in an effort to straighten out the sifted [sic] floors" (emphasis added). Docket Entry 8-1, at 85. Proposed work covered by the estimate also includes demolishing and removing damaged electrical wiring and water-damaged insulation and reassembling the structural support for the porch. Even plaintiff's expert does not attribute the settling of support columns in the basement, damage to the wiring or insulation, or the shifting of the structural support for the porch to the wind forces on the property during Storm Sandy. Furthermore, the PFY estimate, while it concludes as Simpson has that "the building's structural frame installations have shifted from its [sic] plumb axis atop of the foundation," attributes the shifting not to wind forces alone but to "huge debris (e.g. portion of boardwalk, cars etc.) coming in contact with the structure." Docket Entry 8-1, at 82. As discussed above, however, photographs of the building's exterior reflect little if any damage from Sandy. Surely, if a windblown car or

---

[3] A transcript of the hearing testimony has not yet been prepared. The citation in the text is taken from the Court's audio recording of the proceedings.

large portion of the boardwalk had struck the building, there would be visible damage to the building's exterior as a result.

Plaintiff has similarly failed to establish a likelihood of success on its claim of entitlement to renewal of its insurance policy with Canopius. Plaintiff contends that defendant created a proverbial "Catch-22" by denying coverage for damage to the property and then refusing to renew the policy because of the property's damaged and unrepaired state. This argument, of course, rests on the premise that plaintiff was entitled to coverage and that Canopius wrongfully declined to provide it. Furthermore, as plaintiff concedes, the policy would have expired on August 7, 2013, but for the Order of the Queens County Supreme Court.[4] The policy does not provide for renewal as a matter of right; defendant could have decided not to renew for any reason or no reason at all. "Under New York law, the renewal of an insurance policy constitutes a separate and distinct contract with a period of time covered by the renewal." *In re New England Marine Servs., Inc.*, 174 B.R. 391, 397 (Bankr. E.D.N.Y. 1994). I therefore conclude that plaintiff is not likely to succeed on its claim of entitlement to renewal of its policy.

---

[4] The policy, as written, expired on June 22, 2013. Poust Decl. ¶ 3, Docket Entry 9-5. However, New York Insurance Law § 3426(e) requires written notice to an insured that a policy will lapse at least sixty days prior to its expiration and provides that, in the event of late notice, the expiration date is extended to sixty days after notice is given. Here, defendant provided notice on June 7, 2013, and the policy therefore in fact expired on August 7, 2013, or would have absent the order issued in Queens County Supreme Court. *Id.* ¶ 4.

## CONCLUSION

For all the reasons stated above, plaintiff's motion for a preliminary injunction is denied and defendant's motion to dissolve the temporary restraining order is granted.

**SO ORDERED.**

／s／
Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
September 3, 2013

U:\smg current docs\cashew pi.docx